UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

CLINTON GRIFFIN,

        Plaintiff,

        v.                                              Case No. 18-C-1804

AT&T UMBRELLA BENEFIT PLAN NO 3,

        Defendant.

## DECISION AND ORDER

Plaintiff Clinton Griffin commenced this action for judicial review of the denial of his claim for disability benefits under the AT&T Umbrella Benefit Plan No. 3 (the Plan) in violation of § 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974 (ERISA). The court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331. Both parties have filed motions and supporting briefs for summary judgment, which in cases seeking deferential judicial review of ERISA plan determinations, perform essentially the function of appellate briefs. For the reasons that follow, the Plan's motion for summary judgment will be granted thereby affirming the Plan's denial of the claims and Griffin's motion for summary judgment will be denied.

## BACKGROUND

From early 2014 through February 13, 2018, Griffin worked for Wisconsin Bell, Inc. (Wisconsin Bell) as a premises technician. R. 1649. Wisconsin Bell is a participating company in the Plan, which named AT&T Services, Inc. as administrator for purposes of Section 3(16)(A) of ERISA and as a fiduciary under Section 402 of ERISA. R. 21, 35. The Plan's claims

administrator was Sedgwick Claims Management Service, Inc. (the Claims Administrator). R. 86. As a premises technician, Griffin's job duties required climbing stairs and ladders, driving a company vehicle, working with hand tools, and lifting up to 80 pounds.

The Plan offered both short-term disability (STD) and long-term disability (LTD) benefits to qualifying participants. R. 12, 75. Under the Plan, a participant is eligible to apply for STD benefits when they meet the definition of "Disability," are employed by a participating company in the Plan, and miss seven consecutive days of work because of the "Disability." R. 62. The Plan informs participants that for purposes of STD benefits a participant has a "Disability" when the Claims Administrator in its "sole discretion" determines that the he or she is

> Disabled by reason of sickness, pregnancy, or an off-the job illness or injury that prevents you from performing the duties of your job (or any other job assigned by the Company for which you are qualified) with or without reasonable accommodation. Your Disability must be supported by objective Medical Evidence.

*Id*. LTD benefits are available under the Plan only if the eligible participant has received 52 weeks of STD benefits, the participant's medical providers submit all requested medical information, and the participant files an LTD benefit claim within six months after the period providing STD benefits concludes. R. 76–77.

Griffin claims he suffers from depression, severe obstructive sleep apnea, and myalgic encephalomyelitis/chronic fatigue syndrome (CFS). The Plan denied his claims for STD based on the record before it. Although the court's review is limited to the record before the Plan, the parties have submitted Proposed Findings of Fact in which they unhelpfully attempt to re-characterize the record instead of citing directly to the record itself. Given the local rules that govern summary judgment in this district, the fault may lie with the court for failing to make clear to the parties that where it is not de novo, judicial review in ERISA cases, like judicial review in

social security disability cases, is based on the record, and not either party's characterization of the record. For this reason, the court has ignored the party's proposed findings of fact and focused on the administrative record in setting out the background and in reaching its decision in this matter.

As relevant here, Griffin missed work on April 2, 2017. A week later, on April 9, 2017, he applied for STD benefits (the First Claim) citing symptoms of fatigue and tiredness. R. 109, 120. Griffin initially did not identify his physician or provide medical information. On April 20, 2017, the Claims Administrator learned that Griffin had seen Physician Assistant Suzette Lee on April 11, 2017. R. 127, 692. She noted Griffin complained of chronic fatigue and unrefreshed sleep. He had a puppy for the last three months, "so sleep pattern is worse." R. 692. PA Lee also noted Griffin was exercising with a personal trainer three times per week, had decreased fast food intake, and was eating healthy foods four times a day. *Id.* PA Lee informed the Claims Administrator that she had only seen Griffin one time and had suggested that he undergo a sleep study, but did not authorize him to take off of work, noting that many people with sleep apnea work. R. 132–33.

Two physicians were assigned by the Claims Administrator to review the First Claim, Dr. Neal Sherman (an internist) and Dr. Lawrence Albers (a psychiatrist). R. 136, 143. As consulting physicians, Dr. Sherman and Dr. Albers reviewed the evidence in the claim file. R. 786, 800. Dr. Sherman found no indication that, in light of PA Lee's findings, a treating provider had restricted Griffin's activities. R. 137. Dr. Albers observed "no indication of severity of psychiatric symptomatology that would preclude work functioning." R. 139. The Claims Administrator denied Griffin's First Claim on May 16, 2017, because his treating provider and the consulting physicians did not find that Griffin could not perform his job duties. R. 634. After his claim was

3

denied, Griffin resumed work the next day and continued working until September 4, 2017. R. 647, 704. Griffin appealed the denial of his First Claim on August 17, 2017. R. 164.

Griffin did not return to PA Lee. Instead, he sought treatment from Dr. Isaias Cupino in June 2017. R. 569. Griffin reported chest pain, heartburn, depression, and insomnia, but was negative for back pain, joint pain, myalgias, and neck pain. R. 571. Dr. Cupino's treatment notes from a follow-up visit in July 2017 indicate Griffin continued to complain of intermittent fogginess, chronic fatigue, unrefreshed sleep, and migraines. R. 534. Griffin was referred for sleep treatment and saw Dr. Richard Potts, who ordered a home sleep apnea test. R. 538, 585. On August 7, 2017, Dr. Potts diagnosed Griffin with severe Obstructive Sleep Apnea (OSA) and recommended a CPAP machine. Among his recommendations, Dr. Potts listed: "Patient should be advised not to drive, operate dangerous equipment or participate in potentially dangerous activities when sleepy." R. 586.

Dr. Cupino saw Griffin the next month and noted his continued complaints of chronic fatigue, mild intermittent fogginess, unrefreshed sleep, and migraines; he also complained of daytime somnolence. R. 517. Dr. Cupino signed an "Excuse Slip" addressed "to whom it may concern" on September 26, 2017, stating that Griffin was under his care, was seen in his office that day, and was "unable to return to work at this time because of medical issues." The slip included the notation "Off work 8/31/17 thru 10/10/17." Dr. Cupino referred Griffin to a rheumatologist the same day. R. 535.

Eleven days earlier, on September 15, 2017, Griffin had filed a second application for STD benefits (the Second Claim), listing diagnoses of sleep apnea and chronic fatigue. R. 703–04. Like his first claim, he did not request a job accommodation or a change of workspace or job duties. R. 704–05. During a phone call on September 29, 2017, Griffin was told that the medical

4

information the Claims Administrator received was "very limited." Griffin told the Claims Administrator he was set to see a rheumatologist about his obstructive sleep apnea. Griffin refused to tell the Claims Administrator the name and telephone number of the rheumatologist, however, and instead told the Claims Administrator that his "job is a joke," at which point the conversation ended. R. 724.

Upon reviewing the medical information submitted in support of Griffin's Second Claim for STD benefits, the Claims Administrator noted that additional medical information was needed to substantiate his claim that he was unable to work. R. 726. Griffin called the Claims Administrator on October 11, 2017, while his Second Claim remained under review. R. 730. The examiner informed him that Dr. Cupino had been contacted for additional information. Griffin uttered profanities and told the examiner "he was terrible [at his] job." R. 730–31.

The Claims Administrator told Griffin by phone on October 12, 2017, that his second claim for STD benefits was denied because there was "insufficient objective information to support functional impairment from heavy job duties." At the same time, the Claims Administrator told Griffin that he could provide additional information. R. 733. Griffin received a written denial letter on October 13, 2017, which noted that his claim lacked evidence that he could not perform his job and observed "no abnormalities" in his physical exam. R. 1118. Griffin resumed working on October 25, 2017. R. 734–35.

Griffin saw Dr. Paul Tuttle, a rheumatologist, for the first time on October 12, 2017. Dr. Tuttle noted Griffin's complaints of joint and back pain and chronic fatigue, among other symptoms. R. 489. Dr. Tuttle noted that Griffin "may have" CFS, but stated he would evaluate him for inflammatory disease. R. 493. On October 26, 2017, Dr. Tuttle's office issued a "return to work slip" stating that Griffin "is to be off work due to possible autoimmune disease[.] He is

5

totally incapacitated at this time. Patient will be re-evaluated on 11/13/2017." R. 495. Griffin refiled his Second Claim after this visit with Dr. Tuttle and requested benefits to begin on October 31, 2017. R. 1196.

At the November 2017 reevaluation, Dr. Tuttle observed that Griffin reported ongoing fatigue and was not relieved by depression-related medication or prednisone. R. 496–99. Griffin reported the prednisone Dr. Tuttle had prescribed did not help. He was trying to exercise more but said he "will pay for it if he does too much." Although he also said the depression medicine did not help, he did not feel depressed. He thought the CPAP machine "may help some." R. 496. Griffin's physical exam produced all normal findings, other than obesity. R. 497. Under "Impression and Recommendations," Dr. Tuttle listed Problem # 1 as Fatigue, which he attributed to "probable chronic fatigue syndrome without signs of a rheumatological disease;" Problem # 2 as back pain although the MRI was normal, and Problem # 3 as dyspnea on exertion. R. 498. Under "Patient Instructions," Dr. Tuttle listed "exercise as tolerated," "see your lung doctor about the breathing," and "return as needed." *Id.* On November 21, 2017, Dr. Tuttle completed a "return to work slip" which listed arthralgia, dyspnea on exertion, myalgia, and fatigue as the diagnoses. R. 466. This slip indicated that Griffin could return to work on November 22, 2017, though his "conditions and the severity of the symptoms require him to work in a sedentary position." *Id*. The slip noted that the restrictions were "life long conditions and should be considered permanent restrictions." *Id.* On December 15, 2017, Dr. Tuttle completed and signed a questionnaire at the Claims Administrator's request in which he stated that Griffin was released for light-duty work effective November 22, 2017. R. 464–65. The form restricted Griffin to ground level work and noted that he should not operate hazardous machinery or vehicles or climb ladders or poles. Again, Dr. Tuttle noted the restrictions were permanent. R. 465.

The Claims Administrator assigned Dr. Anup Sanghvi, a family medicine physician, to review the Second Claim in light of the new information from Dr. Tuttle. R. 1215–19. Dr. Sanghvi advised granting Griffin's Second Claim for the period from October 31 to December 17, 2017, during which time he would use his CPAP machine on a regular basis and undergo a pulmonology evaluation, but stated that he should be revaluated after December 15, 2017. R. 1217. Griffin's Second Claim for STD benefits was granted by the Plan for this period. R. 1220–21. On December 15, 2017, the Claims Administrator telephoned Griffin to inform him that, consistent with Dr. Sanghvi's conclusion, Griffin was to provide additional evidence to qualify for subsequent STD benefits. R. 1217, 1222–23. When he failed to do so, his Second Claim (covering the period from December 18, 2017 to January 22, 2018) was denied by the Claims Administrator on December 28, 2017, based on a lack of information supporting his claim that he was unable to perform his job duties. R. 1370.

On January 2, 2018, the Claims Administrator received Dr. Cupino's progress notes from a December 12, 2017 follow up visit. R. 1476–80. Dr. Cupino noted Griffin's complaint of chronic fatigue since 2014. Dr. Cupino noted "recent labs on 6/13/2017 were all normal," and the etiology of Griffin's fatigue was "unknown." R. 1476. The report notes that Griffin had been referred for rheumatology to Dr. Tuttle, who had diagnosed him with chronic fatigue syndrome. *Id.* Dr. Cupino also noted Griffin's CPAP needed adjustment. *Id.* In his assessment, Dr. Cupino listed CFS as a "new problem," noted the etiology was unknown and no medication had been prescribed, but that Griffin was advised to gradually increase exercise. R. 1479. Finally, under "Plan," Dr. Cupino wrote "follow up 1 month as needed" and "off work 12/12/2017 to 1/12/2018." R. 1480.

Dr. Sanghvi was asked to review the updated file and advise whether it showed Griffin was disabled. On January 5, 2018, Dr. Sanghvi issued his report concluding that the medical record did not support Griffin's claim. Dr. Sanghvi explained:

> Mr. Giffin (DOB  -1983) works as a Premise Technician with heavy job duties requiring heavy lifting, bending, reaching, squatting, kneeling, overhead working, using of hand tools, climbing, pushing and pulling. The stated diagnoses include sleep apnea, obesity, chronic fatigue syndrome, back pain. The employee is using a CPAP machine. The details of the sleep study prior to and after the use of a CPAP machine was not specified in the records provided. The details of symptoms such as day time sleepiness or dizziness along with objective findings of high Apnea-Hypopnea index on a sleep study with the appropriate use of a CPAP machine was not specified in the records provided. Per the notes, the patient had a normal MRI in the context of back pain. There were no significant abnormal objective physical exam findings or lab tests or imaging studies in the records provided that would substantiate a medical need for restrictions or limitations at this time. There were no objective, observable findings in the records provided to support/substantiate a medical need for any restrictions and limitations to the employee's heavy occupational duties at this as of 12/12/17 – 1/12/18.

R. 1030.

Griffin informed the Claims Administrator on January 2, 2018, that he planned to appeal each of the benefit denials from the prior year. R. 500. Dr. David Silver (rheumatologist), Dr. Hameed Dosunmu (internist), and Dr. Tahir Tellioglu (psychiatrist) performed reviews of Griffin's file prior to the Claim Administrator's denial of the appeal on February 15, 2018. R. 817–19. To the extent that Griffin's treating providers were responsive to the Claim Administrator's inquiries, the Claims Administrator concluded they did not provide sufficient evidence to support restriction or limitation on Griffin's ability to work or a finding of disability, according to the Plan. R. 817–19, 1246–48. Accordingly, the subsequent claim denial informed Griffin that "[a]lthough some findings are referenced, none are documented to be so severe as to prevent you from performing the job duties of Premises Technician with or without reasonable

8

accommodation from April 9, 2017 through May 16, 2017, September 14, 2017 through October 24, 2017, and December 18, 2017 through January 21, 2018." R. 818.

A third claim for STD benefits (the Third Claim) was submitted by Griffin on January 22, 2018. R. 1629–30. Griffin applied for benefits to start on January 23, 2018, based upon his sleep apnea and CFS. *Id.* Again, he did not request a change in his workspace or job duties or any job accommodation. *Id.* It appears Griffin saw Dr. Cupino for another follow up visit on January 25, 2018. R. 1687–91. Dr. Cupino's progress notes are almost an exact duplicate of his progress notes from the December 12, 2017 visit, consisting of the same history, normal vital signs and physical examination, and same assessment. *Id.* The plan is to again follow up in a month if needed and remain off work from January 12, 2018 to February 27, 2018. R. 1691. Griffin did not submit any medical information with the Third Claim, and the Claims Administrator denied the claim for this reason on February 7, 2018. R. 1645.

On February 8, 2018, the Claims Administrator reopened the Third Claim because it received medical information from Griffin. R. 1646. Griffin lost his position at Wisconsin Bell on February 13, 2018, due to a workforce reduction; the coverage period for his Third Claim became January 23, 2018 to February 13, 2018. R. 1649. The Claims Administrator denied Griffin's reopened Third Claim on February 19, 2018, citing the lack of information that showed a condition precluding Griffin from performing his job duties. R. 1654, 1663–64.

## ANALYSIS

The parties have filed cross motions for summary judgment. They agree, however, that the arbitrary and capricious standard applies to the court's review of the Plan's denial of Griffin's claim. When a plan vests discretionary authority in an administrator to determine benefit eligibility, the Plan's denial of benefits may only be reversed upon the court's finding that the

9

Plan's denial was arbitrary and capricious. *Jenkins v. Price Waterhouse Long Term Disability Plan*, 564 F.3d 856, 861 n.8 (7th Cir. 2009). In applying this standard, the court looks only to ensure that the administrator's "decision has 'rational support in the record.'" *Id.* (quoting *Davis v. Unum Life Ins. Co. of Am.*, 444 F.3d 569, 576 (7th Cir. 2006)). While the deferential standard does not make the court "a rubber stamp," it does mean that the court "cannot reverse course unless a decision is 'downright unreasonable.'" *Id.* As such, a "plan administrator's decision will not be overturned 'absent special circumstances such as fraud or bad faith, if "it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome."'" *Dragus v. Reliance Standard Life Ins. Co.*, 882 F.3d 667, 672–73 (7th Cir. 2018) (quoting *Exbom v. Cent. States, Se. & Sw. Areas Health & Welfare Fund*, 900 F.2d 1138, 1142 (7th Cir. 1990) (quoting *Pokratz v. Jones Dairy Farm*, 771 F.2d 206, 209 (7th Cir. 1985))).

The Seventh Circuit has observed that CFS "like fibromyalgia, poses unique issues for plan administrators, since for both conditions, '[i]ts cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective.'" *Williams v. Aetna Life Ins. Co.*, 509 F.3d 317, 322 (7th Cir. 2007) (quoting *Hawkins v. First Union Corp. Long–Term Disability Plan*, 326 F.3d 914, 916 (7th Cir. 2003)). *Williams* distinguished "between the amount of fatigue or pain an individual experiences, which as *Hawkins* notes is entirely subjective, and the degree to which an individual's pain or fatigue limits his functional capabilities, which can be objectively measured." *Id.* Because an individual's functional limitations due to fatigue can be measured objectively, the *Williams* court concluded that a plan does not act arbitrarily and capriciously in denying an application for disability benefits when the record lacks accurate documentation of the claimant's functional limitations. *Id.* at 323. It was for this reason that the Plan denied Griffin's claims in this case.

Relying primarily upon this court's decision in *Weitzenkamp v. Unum Life Insurance Company*, No. 09-C-1017, 2010 WL 4806979 (E.D. Wis. Nov. 19, 2010), *aff'd in part, rev'd in part on other grounds*, 661 F.3d 323 (7th Cir. 2011), Griffin argues that his medical providers' opinions alone constitute objective evidence of his CFS work-related limitations. *See* Dkt. No. 32 at 2–3. In *Weitzenkamp*, this court concluded that the Unum's denial of the plaintiff's disability claim on the ground that it lacked objective evidence of her functional limitations was arbitrary and capricious. In reaching this conclusion, the court rejected Unum's argument that the plaintiff's doctor's assessment of her functional capacity did not constitute objective evidence, noting that if her doctor's assessment is not considered objective evidence, "then it is hard to envision Unum ever paying disability benefits based on disabling fibromyalgia because in every such case the limitations described by the physician will be based primarily on Plaintiff's own self-reported symptoms." 2010 WL 4806979 at *4. The court explained:

> When a physician asked to assess a patient's functioning fills out a form describing limitations due to fibromyalgia, which is a condition characterized by self-reported levels of pain, tender points, and fatigue, it follows that the doctor's conclusions will in some respect be based on the Plaintiff's own self-reported symptoms. That is the nature of fibromyalgia. For the insurer to later claim that it denied the claim not because fibromyalgia is a subjectively experienced disease but because there was no objective medical evidence of the claimant's limitations is essentially circular under these circumstances. Here we have the Plaintiff's treating rheumatologist, who indicates he saw Plaintiff every 2–3 months for two and one-half years, who filled out the questionnaire and indicated all of her limitations. Unum has not explained what more "objective" evidence Partain or the Plaintiff could have provided.

*Id.*

Although Griffin contends that he offered the same evidence here, the record shows he did not. What Griffin presented as "objective proof," beyond the couple of pages of office notes and brief "work slips" is the one-page questionnaire that Dr. Tuttle completed at the Claims Administrator's request stating that Griffin was limited to "ground level work only" with "no

11

climbing, lifting, pushing, pulling, kneeling, twisting etc."; "no hazardous machinery operation of vehicle driving"; no climbing of ladders or poles, and should be restricted to light-duty work effective November 22, 2017. Dkt. No. 25 at 20; R. 465. As the Plan notes, however, Griffin offered nothing more than his medical provider's conclusory opinions about how CFS may limit his job performance. Neither Griffin nor his doctor presented any objective test results showing, for example, Griffin's diminished ability to lift weights, climb stairs or ladders, or perform other job duties because of his CFS. *See* Dkt. No. 27 at 22–23.

In *Holmstrom v. Metropolitan Life Insurance Company*, 615 F.3d 758, 770 (7th Cir. 2010), the plaintiff was diagnosed with complex regional pain syndrome (CRPS), a condition that like fibromyalgia and CFS, is diagnosed based on subjective symptoms that are not manifested by objective clinical data. In support of her claim for disability benefits under the plan in that case, the plaintiff presented two functional capacity evaluations (FCEs) to demonstrate the effect of her CRPS on her ability to perform her job. The court's description of the evidence in that case stands in stark contrast to what Griffin submitted here:

> The 2007 FCE report included 20 different detailed tests. Six examined arm function, and seven examined hand function. Each result included specific weight and time data, and applied that data to the lowest possible occupational exertion category as determined by the Department of Labor. Holmstrom fell short of the requirements of sedentary work in the majority of these tests. The tests were repeated one day later, with "all measured parameters recorded [at] a reduction of about 20%," which suggested consistency of effort and "very poor endurance." Those results indicated that it was unlikely that Holmstrom would be able to sustain even her severely compromised level of function over consecutive workdays, as needed for full-time employment.

*Id.* at 770–71. In holding that the plan's denial of the plaintiff's claim was arbitrary and capricious, the court noted the difference in the evidence that was found insufficient in *Williams*:

> Unlike the present case, however, the *Williams* record "lacked any specific data reflecting Williams's functional impairment." *Williams*, 509 F.3d at 323. Williams never presented an actual FCE or any measurement of specific limitations. He

> offered only his treating physician's unexplained conclusions that he could perform only low-stress jobs and could not lift anything over ten pounds. Aetna gave this physician a functional capacity questionnaire asking for the results of very specific functional tests (e.g., how long Williams was able to stand before needing to sit down), which were answered "unknown" or "untested." No specific tests of physical ability or endurance were ever performed.

*Id.* at 771. The evidence offered by Griffin in this case is essentially the same as that offered in *Williams*. Just as the court found that the plan's denial of the claim in that case for lack of objective evidence of the functional limitations of the plaintiff's CFS was not arbitrary and capricious, the court reaches the same conclusion here.

The Plan's requirement for objective information was stated explicitly in the Plan documents: "[t]he Disability must be supported by objective Medical Evidence." R. 62. This requirement was reiterated in the Plan's letters denying Griffin's claims. For example, in denying Griffin's claim, the Claims Administrator advised Griffin by letter dated October 13, 2017:

> For your claim to qualify for benefits, AT&T IDC would need clear medical evidence from your current treating provider(s) of why you are not able to perform the essential duties of your occupation. Your treating physician would need to document your functional impairments as they relate to your diagnosis and provide a treatment plan that addresses plans for your return to work with or without reasonable restrictions with a reasonable duration. This information may be included in the following: serial 7 exam, mental assessment exam, chart or progress notes, specialist's report(s), or any other clear observable medical information you feel supports your inability to perform your job duties with or without reasonable restrictions.

R. 1118–19. Griffin failed to present such evidence to the Claims Administrator.

The Claims Administrator did not simply rely on his own evaluation of the evidence Griffin did submit, however. He had the evidence reviewed by other physicians. The Claims Administrator's reviewing physicians plausibly explained why the record did not indicate that Griffin was disabled. Griffin attacks these findings, but the court's role at this stage is to determine whether the Plan's decision was reasonable, not to reweigh the opinions of the various

13

physicians.  *See also Sisto v. Ameritech Sickness & Accident Disability Benefit Plan*, 429 F.3d 698, 701 (7th Cir. 2005) ("Raising debatable points does not entitle [the claimant] to a reversal under the arbitrary-and-capricious standard."). Given the absence of objective evidence of the functional limitations of his conditions, the reviewing physicians provided sound reasons for their findings. Dr. Dosunmu, just one of the reviewing physicians relied upon by the Claims Administrator, noted that Griffin's record did not document any "specific internal medicine exam abnormalities" to warrant a work restriction or limitation. R. 227. The other reviewing physicians reached the same conclusion. *See, e.g.*, R. 219, 227, 235, 245, 250.

Nothing in the record suggests that Griffin ever underwent a functional capacities evaluation or similar test to determine what he was actually capable of doing, as opposed to what he said he could do. Instead it appears that his own physicians simply listened to Griffin's own account of what he was feeling, assumed it to be true, and gave him a diagnosis of CFS when objective tests excluded all other known causes of such symptoms. The Plan, acting as a fiduciary for all of the employee members, was not unreasonable in requiring more than that before awarding Griffin disability benefits.

Griffin also faults Dr. Silver, another one of the Plan's reviewing physicians, for giving any weight to PA Lee's opinion and discounting other aspects of Griffin's medical history. Dkt. No. 25 at 23–24. But Dr. Silver's assessment reveals that he did not solely consider PA Lee's findings. Dr. Silver also considered findings from Dr. Cupino, Dr. Potts, and Dr. Tuttle, together with the various peer reviews that had been completed. R. 412–15. Based on this review, Dr. Silver observed that Griffin "was given the diagnosis of chronic fatigue syndrome, although specific work up for that condition had not been performed" and there was "[n]o evidence of an inflammatory or rheumatologic condition." R. 415. Based on consideration of this evidence, Dr.

Silver concluded that Griffin was not disabled. *Id.* His conclusion was not reached in isolation. At the time of his initial application for STD benefits, PA Lee was the only health care provider Griffin had seen. According to PA Lee's notes, Griffin told her he "had chronic fatigue for years, he is working out and has a trainer." PA Lee concluded Griffin "is not disabled to the point where he cannot work." R. 132–33. The lack of evidence favoring Griffin did not mean that the Plan needed to supply such evidence itself or consult additional doctors until it found one that agreed with Griffin. *See Wallace v. Reliance Standard Life Ins. Co.*, 318 F.3d 723, 724 (7th Cir. 2003) ("No case of which we are aware holds that, when a plan participant's own doctors opine that he is again able to work, the insurer or plan administrator must refer the participant to additional physicians in quest of one who will find a disabling condition."). The court is not required to reweigh these medical opinions given the Plan's rational explanation for the weight it afforded them.

Griffin also argues that the Plan cannot reasonably explain why it improperly discounted his treating physicians' opinions regarding his CFS. *See* Dkt. No. 25 at 20. But the Plan did explain why it rejected the opinions of Griffin's own physicians: their opinions were unsupported by the kind of work up and/or objective clinical findings needed to show the kind of debilitating condition claimed. Yet, more to the point, the Plan was not required to weigh the opinions of Griffin's medical providers over its own consulting physicians. Unlike a review of the denial of benefits by the Social Security Administration—where courts afford treating physicians special deference—for plans administered under ERISA "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." *Black & Decker Disability*

*Plan v. Nord*, 538 U.S. 822, 834 (2003). When faced with what becomes "essentially a contest of competing medical opinions" the court defers to the Claims Administrator's "choice between competing medical opinions so long as it is rationally supported by record evidence." *Black v. Long Term Disability Ins.*, 582 F.3d 738, 745 (7th Cir. 2009).

Further, simply because Griffin was granted STD benefits for a short period in 2017 does not mean that Griffin was entitled to earlier or subsequent benefits. Griffin faults the Plan for ignoring Dr. Tuttle's December 15, 2017 assessment when reviewing the appeal for his earlier claims. Dkt. No. 25 at 21. But without more, Dr. Tuttle's subsequent conclusions do not prove that the Plan improperly denied Griffin's *earlier* claims. In other words, Dr. Tuttle's assessment does not become the missing objective proof of Griffin's condition just because the Plan later granted him benefits for a short period of time. "The fact that a plan administrator has made an initial benefits determination in favor of the claimant is evidence that, at least initially, the administrator believed that the claimant was disabled as defined by the plan." *Leger v. Tribune Co. Long Term Disability Ben. Plan*, 557 F.3d 823, 832 (7th Cir. 2009). However, "the previous payment of benefits is just one 'circumstance,' i.e., factor, to be considered in the court's review process; it does not create a presumptive burden for the plan to overcome." *Id.* (citing *McOsker v. Paul Revere Life Ins. Co.*, 279 F.3d 586, 589 (8th Cir. 2002)). Here, starting in October 2017, the Plan granted Griffin STD benefits for a short period, ending December 15, 2017. R. 1588. The Plan noted, however, that his claim should be revaluated after this benefit period expired because his use of a CPAP machine may improve his condition. *Id.* The fact that the Plan stated that additional STD benefits depended upon further review of Griffin's claim does not make its subsequent denial arbitrary or capricious by itself. As explained herein and by the Plan, it had

16

sound reasons to request additional objective evidence that Griffin's condition impacted his functional ability.

In sum, Griffin has failed to demonstrate that the Plan's STD claim denials were arbitrary or capricious. What the Plan requested, in accord with *Williams* and *Holstrom*, was objective evidence from his medical professionals demonstrating that Griffin's condition would limit his ability to function on the job. For the time periods that it denied Griffin's claim, the Plan told Griffin what it was seeking and, when he failed to provide such objective medical information, it explained why his applications were denied. Under the arbitrary and capricious standard of review, the Plan's findings and conclusions must stand. And because the denial of his claim for STD benefits stands, Griffin had no claim for LTD benefits. Accordingly, the decision of the Plan is affirmed.

**SO ORDERED** at Green Bay, Wisconsin this 12th day of March, 2020.

s/ William C. Griesbach  
William C. Griesbach, District Judge  
United States District Court